**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| DERRICK GADDY , | ) |
| | ) |
| Plaintiff, | )   Case. No. 10 C 0436 |
| v. | ) |
| | )   Magistrate Judge |
| Michael J. Astrue, | )   Arlander Keys |
| Commissioner of Social | ) |
| Security | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

PRE-DECISION PROCEDURAL HISTORY

On June 7, 2006, Derrick Gaddy filed applications for
Disability Insurance Benefits and Supplemental Security Income.
Mr. Gaddy's claims were denied on September 27, 2006, and upon
reconsideration denied on February 2, 2007.  (R. 75-78.)
Subsequently, Plaintiff requested a hearing before an
Administrative Law Judge ("ALJ").  ALJ Edwin Shinitzky held a
hearing on June 15, 2009, in Chicago, Illinois.  Mr. Gaddy
appeared, represented by counsel, and gave his personal
testimony; testimony was also heard from a medical and vocational
expert.  On July 22, 2009 the ALJ issued a finding that Plaintiff
was not disabled because he could perform a significant number of
jobs in the national economy.  (R. 9-20.)

## POST-DECISION PROCEDURAL HISTORY

Mr. Gaddy requested review by the Appeals Council, but was denied on November 20, 2009, making the ALJ's decision the final decision of the Commissioner. (R. 1-3.) On January 22, 2009, Mr. Gaddy filed a lawsuit in the United States District Court for the Northern District of Illinois seeking review of the ALJ's decision. On March 10, 2011, the parties consented to proceed before a Magistrate Judge, and the case was reassigned to this Court. On December 16, 2011, Mr. Gaddy filed a motion for summary judgment asking the Court to reverse the Commissioner's decision or to remand for further proceedings. On February 17, 2012, the Commissioner filed a response to plaintiff's motion for summary judgment, asking the Court to affirm the ALJs' decision to deny benefits.

Mr. Gaddy seeks a reversal of the ALJ's decision and a remand for award of benefits, or in the alternative, reversal of the ALJ's decision and remand for additional proceedings, questioning whether: (1) the ALJ improperly gave controlling weight to the Medical Expert; (2) the ALJ improperly discounted the opinion of Plaintiff's treating physician; (3) the ALJ's finding was flawed because he failed to consider evidence of Plaintiff's diabetic neuropathy, hand limitations, frequent urination and environmental limitations; (4) the ALJ's credibility analysis failed to properly consider Plaintiff's

complaints or his limited activities of daily living; and (5) the ALJ improperly relied on the vocational expert's testimony. For the reasons set forth below, Plaintiff's motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted.

## II. TESTIMONY BEFORE THE ALJ

<u>MR. DERRICK GADDY</u>

At the time of the hearing, Mr. Gaddy was 36 years old, 5'8", and weighed approximately 330 pounds. (R. 30.) He testified that he had not completed any vocational training nor attended college, but that he completed the 12th grade. *Id.* He testified that he was married with four children. (R. 35.) While employed at Rent-A-Center his wife did not work, however, since becoming unemployed, his wife had been working for the "past couple of months" while he cared for their children full-time. (R. 36.)

With regard to his daily routine, Mr. Gaddy testified that he typically got up at 6:30 A.M., when his wife left for work. (R. 40.) He reported that on a regular day, when school was in session, he made cereal for his kids and walked them to school, which is located across the street. (R. 37, 40.) Mr. Gaddy testified that he lived in a courtway building on the first floor, and that there were twelve steps from his apartment to the street. (R. 52). After taking the kids to school, he sat at

3

home, did some chores, and would go to sleep. (R. 42). He testified that his chores included "picking up the clothes in the front room" and placing them inside a dirty clothes bin. (R. 38.) He testified that he sometimes cooks, but that his wife is primarily responsible for cleaning as he is unable to with his balance not being the best. *Id.* Aside from picking the kids up from school, he does not leave the house and had been following this routine since the "burning sensation" in his feet began. (R.42.) He testified that he can no longer work because of the numbness in his hands and feet. (R. 36.) Mr. Gaddy explained that he does not go on walks, and although he was an athlete in high school, he is now unable to play with his children. (R. 47.) He explained that in high school he weighed around 180 pounds, but was then about 310 pounds. (R. 48.) He had gained around 10 pounds over the past year, and could not remember how long he had stayed in the 310-330 pound range. *Id.* He testified that he caught three buses to come to the hearing, and that he also takes the bus to get to his doctor's appointments. (R. 36-37.)

With regard to his work history, Mr. Gaddy testified that he was last employed in 2005 with Rent-A-Center and that he has not received any compensation for work since that time. (R. 29.) Mr. Gaddy's attorney indicated that Mr. Gaddy's past work history included work as an account manager, cashier, loader, and packer.

4

(R. 30.) While employed at Rent-A-Center, Mr. Gaddy testified
that supervision was not one of his responsibilities. (R. 31.)
Plaintiff was asked by the ALJ if he had performed several job
functions within his retail environment, to which Mr. Gaddy
answered in the affirmative. (R. 30-31.) Mr. Gaddy's attorney
indicated that his duties at Rent-A-Center also included loading
of the equipment onto a truck, packing, taking payments, and
occasional work in the office. (R. 30.)

Mr. Gaddy testified that he had been disabled since
September 1, 2005. (R. 31.) When asked why he is unable to
work, he testified that it is due to the numbness in his hands
and feet that prevent him from working. (R. 36.) He explained
that he sees his doctor every two months, but is unaware if he is
a specialist or a general practitioner. (R. 39-40.) He
testified that, during his visits, the doctor regularly checks
his feet, blood pressure, and vitals. (R. 40.) He testified
that he has not been referred to a specialist for any specific
issues. *Id.*

With regard to the hand numbness, Mr. Gaddy testified about
an incident where he left his hand on the side of the stove while
cooking and, because he was not paying attention, he burned
himself. (R. 43.) He explained that his "hand got numb" and he
did not notice he was being burned because he "didn't feel it
really". *Id.* When asked if he had trouble with moving his

5

hands, Mr. Gaddy answered in the affirmative and testified to having a hard time picking up small things. (R. 48.)

Additionally, Mr. Gaddy testified that he has a hard time maintaining his balance. He testified that he could lift a gallon of milk with one hand, but not both hands because he needed his other hand to steady his balance. (R. 45-46.) He testified he could never have both of his hands full at once. (R. 46). Mr. Gaddy explained that there have been multiple incidents in which his legs have given out on him. (R. 39.) He testified that, about six months prior to the hearing, he had fallen in the shower. *Id.* Mr. Gaddy characterized the fall as a collapse and that he broke a shower rod that he went to grab as he went down. *Id.* When asked if there were any other incidents like this, he testified that his legs also gave out on him a few years prior. *Id.*

When examined by his attorney, Mr. Gaddy testified to problems with his attention and concentration. (R. 49.) He testified that he sometimes "loses vision" and that his vision can get blurry. *Id.* However, he has never worn glasses and does not have any restrictions on his drivers license. *Id.* He made an appointment to see an optometrist, but at the time of the hearing he had not yet seen one. *Id.* Additionally, he testified to experiencing headaches and or dizziness maybe twice a week. (R. 50.)

Mr. Gaddy testified to experiencing difficulties with his heart. The ALJ asked Mr. Gaddy if he had any heart problems, to which he answered, "my heart always acts up". (R. 51- 52.) He testified that in 2005 he was told by his doctor, during the same visit that he was diagnosed as a diabetic, that he also had an enlarged heart. *Id.* Aside from that, Mr. Gaddy testified that he had not been informed by any doctor of anything else specific regarding his heart. (R. 52.)

MEDICAL EXPERT

Next, the ALJ heard testimony from Dr. Sheldon J. Slodki, a Medical Expert ("ME") board certified in internal medicine with a sub-specialty in cardiovascular diseases. (R. 54.) Dr. Slodki testified that he had reviewed the record and could offer an opinion as to the severity of Mr. Gaddy's condition. *Id.*

Dr. Slodki testified that Mr. Gaddy had "a number of impairments that more than minimally affect his ability to do work related activities". *Id.* Dr. Slodki proceeded to name Mr. Gaddy's ailments and provided their corresponding listing numbers, if applicable, and his findings were as follows: Diabetes mellitis, Type II, insulin dependent, 9.08, hypertension with left ventricular hypertrophy, no listing, bilateral Carpal Tunnel Syndrome, 1.02, diabetic neuropathy, 11.14 or 9.088, low back pain, 1.04, morbid obesity with a BMI of 49.7, no listing,

7

coronary artery disease, 4.04, pancreatitis, 5.08, and Type III
hyperlipidemia, no listing. (R. 55-61.)

There was debate over whether Mr. Gaddy had a history of
alcohol consumption and abuse. (R. 31-32.) When asked if he
consumed hard liquor or beer on a regular basis, Mr. Gaddy
testified that he did not. (R. 31). He testified that he had on
occasions consumed alcoholic beverages, but that he never binged
to the point of losing consciousness, and that he had never been
treated for any medical problems related to alcohol. (R. 32.)
However, Dr. Slodki testified that the record showed on April 12,
2009 and October 19, 2008, Mr. Gaddy was admitted for acute
pancreatitis, and one of the treating doctors felt it was
possibly related to alcohol consumption. (R. 56.) Dr. Slodki
further testified that Mr. Gaddy's Type III hyperlipidemia, in
conjunction with his pancreatitis, made alcohol consumption very
dangerous and possibly fatal. (R. 57.) There was confusion
between Dr. Slodki, Mr. Gaddy's counsel, and the ALJ as to where
in the record Dr. Slodki found the history of alcoholism. (R.
58-61.) Upon clarification, the ALJ decided to accept Mr.
Gaddy's hearing testimony that he did not drink heavily. (R.
60.)

With regard to Mr. Gaddy's ailments, and their affect upon
his ability to function in a work setting, Dr. Slodki testified
that Mr. Gaddy had an EMG for his upper extremities, but that his

"symptoms are related to both upper and lower extremities- he's [Mr. Gaddy} described a number of circumstances in which the loss of sensory in the legs have affected him." (R. 61.) Dr. Slodki testified that the complications with his upper and lower extremities did not in and of itself equal a listing, but it required him to reduce Mr. Gaddy to only sedentary work because of "his balance problems and a lack of reliability in his ambulatory endeavors." (R. 62.) Dr. Slodki further testified that while obesity did not have its own listing, Mr. Gaddy's combination of morbid obesity and mild peripheral neuropathy did affect his ambulatory ability. *Id.* However, he did not meet the requirements to classify his ambulatory problems as ineffective ambulation, 1.00(b)(2)(B) or manipulative, 1.00(b)(2)(C). *Id.*

The ALJ asked Dr. Slodki whether Mr. Gaddy would need aides or assistive devices in order to work, to which Dr. Slodki responded there was no need. (R. 62.) Dr. Slodki testified that Mr. Gaddy would be able to occasionally use his hands in a sedentary capacity for manipulation. (R. 63.) Additionally, Dr. Slodki testified that the record did not reflect that Mr. Gaddy currently suffered from uncontrolled edema, but that he had been prescribed medication that now controlled the edema. Therefore, he did not believe Mr. Gaddy required elevation of his feet. (R. 63-64.)

## VOCATIONAL EXPERT

Lastly, the ALJ heard testimony from Dr. Richard J. Hamersma, a Vocational Expert ("VE"). Dr. Hamersma testified that there would be a limited range of jobs that would be both sedentary and allow for only occasional manipulation. (R. 66.) The ALJ solicited the VE's opinion on the number of positions available to people with only a high school education and similar limitations, and Dr. Hamersma replied there were about 1,500 jobs available as an information clerk. *Id.* The ALJ further asked the VE to narrow the field by taking a "step five view in regard to the informational clerks", and the VE replied that, although they existed, there would be "very, very few" positions. *Id.* Next, the ALJ asked the VE whether there was a possibility for Mr. Gaddy to work as a telephone solicitor. However, due to the limitations of his hands, the VE opined that the amount of writing, use of a keyboard, and frequent handing and answering of phones would not be ideal for Mr. Gaddy's condition. (R. 68.)

Ultimately, Dr. Hamersma concluded that the two main positions Mr. Gaddy could successfully perform were informational clerk and identification clerk, with 1,500 and 2,000 positions respectively available. (R. 69.) Considerable discussion centered around how frequently Mr. Gaddy would have to make trips to the bathroom facilities, as he testified to having to use the restroom around four times within a two and a half hour time

span. (R. 70.) Following the testimony, Mr. Gaddy's counsel asked Dr. Hamersma whether the positions he thought Mr. Gaddy could perform would permit more frequent bathroom breaks, to which he replied he did not believe so. (R. 71.) The ALJ then asked the ME whether there was reference in the record of urinary difficulties. (R. 72.) Dr. Slodki answered no, but explained that he is taking a diuretic, and when his diabetes is out of control and his blood sugar high he would need to urinate more frequently. *Id.*

Finally, regarding Mr. Gaddy's concentration and ability to perform the suggested positions, Mr. Gaddy's counsel asked the VE whether frequent interferences with his attention would eliminate the position of surveillance monitor, to which the VE said yes. (R. 73.)

### III. MEDICAL RECORDS BEFORE THE ALJ

In addition to the testimony from Mr. Gaddy, the ME, and VE, the ALJ also considered various relevant medical records and evaluations from doctors that previously treated Mr. Gaddy.

DR. ROMEO URSUA

The record shows that on April 27, 2006, Mr. Gaddy was examined at Loretto Hospital's emergency room. (R. 259.) His admitting diagnosis was chest pain and hypertension. (R. 263.)

## DR. MARK BURANOSKY

On August 2, 2006, Mr. Gaddy saw ophthalmologist Mark
Buranosky, M.D. for an Ophthalmology Consultative Examination for
the Bureau of Disability Determination Services. (R. 267.) Mr.
Gaddy reported experiencing blurred vision since his diagnosis
with diabetes in March 2006. (R. 267.) Dr. Buranosky noted Mr.
Gaddy's diabetes, however, he did not find any sufferance of
diabetic retinopathy. *Id.* Dr. Buranosky credited unstable blood
sugar as the cause of Mr. Gaddy's blurred vision, and suspected
improvement once stabilized. *Id.* Overall, Dr. Buranosky found
that Mr. Gaddy should have no difficulty ambulating into or out
of the office, that his examination was unremarkable, and that he
"should have no restriction." *Id.*

## DR. NORMA VILLANUEVA

On September 7, 2006, Mr. Gaddy saw Norma Villanueva, M.D.
for an Internal Medicine Consultative Examination for the Bureau
of Disability Determination Services. (R. 270.) Mr. Gaddy
reported that five months prior, he had gone to a doctor for a
check up and was found to have elevated blood sugar. *Id.*
Additionally, he reported that he felt okay and denied any
hospitalization, but complained of occasional blurred vision.
*Id.* Mr. Gaddy reported that in 2004 he had bouts of headaches
and dizziness and that sometimes the dizziness prevented him from
walking. He was admitted to West Suburban Hospital and stayed

- 12

there seven hours until his blood pressure went down. *Id.*
Additionally, Mr. Gaddy reported that he had stopped drinking and
smoking marijuana a year prior. (R. 271.) Following the
examination, Dr. Villanueva noted that Mr. Gaddy had full
painless range of motion in all joints. *Id.* Also, Dr.
Villanueva recorded that Mr. Gaddy had normal grip strength
bilaterally and that his ability to grasp, finger, and manipulate
with each hand was entirely normal. *Id.* Overall, Dr. Villanueva
found Mr. Gaddy to be alert and cooperative, and noted that Mr.
Gaddy was taking medication for his diabetes mellitus, medication
was controlling his hypertension, but that no medications were
being taken for his hyperlipidemia. (R. 272.)

DR. TOWFIG ARJMAND

On September 21, 2006, Non-examining consultative physician,
Dr. Towfig Arjmand, filled out a Physical Residual Functional
Capacity sheet on Mr. Gaddy's behalf. (R. 275-282.) With regard
to Mr. Gaddy's exertional limitations, Dr. Arjmand found that Mr.
Gaddy could: occasionally lift fifty pounds, frequently lift up
to twenty five pounds, stand and/or walk- with normal breaks-
about six hours out of an eight-hour workday, sit- with normal
breaks- about six hours in an eight hour workday, and was
unlimited in his ability to push and/or within the range of his
capacity to lift. (R. 276.) With regard to postural
limitations, Dr. Arjmand found that, due to Mr. Gaddy's obesity

13

he could: climb ramps/stairs frequently, but recommended that he never climb ladders/ropes/scaffolds, balance frequently, stoop frequently, kneel frequently, crouch occasionally, and crawl occasionally. (R. 277.) With regard to manipulative limitations, visual limitations, and communicative limitations, Dr. Arjmand found none established. (R. 278-279.) With regard to environmental limitations, Dr. Arjmand thought Mr. Gaddy should avoid concentrated exposure to hazards, such as machinery or heights. (R. 279.) Additionally, Dr. Arjmand noted that Mr. Gaddy was able to get on and off of the exam table, as well as dress and undress without any assistance. (R. 282.) Moreover, he found no evidence of organ damage, he observed a normal ability to grasp and manipulate with each hand, and he placed no restrictions on Mr. Gaddy. *Id.*

DR. ALFONSO BELLO

On January 23, 2008, treating physician Dr. Alfonso Bello, M.D. filled out a Diabetes Mellitus Residual Functional Capacity Questionnaire on Mr. Gaddy's behalf. (R. 283-287.) Dr. Bello recorded that Mr. Gaddy was experiencing numbness and burning in his hands and feet, and that he had been experiencing this since October 30, 2006. (R. 283.) Dr. Bello diagnosed Mr. Gaddy with diabetes mellitus type II, hypertension, diabetic neuropathy, and bilateral carpal tunnel syndrome. His prognosis was that Plaintiff would be "fairly good with medication". *Id.*

14

Mr. Gaddy's symptoms were outlined as follows: extremity pain and numbness, loss of manual dexterity, excessive thirst, vascular disease/leg cramping, swelling, loss of sensory feeling in hands with diminished sensory feeling in fingers, and hyper/hypoglycemic attacks. (R. 283-284.) Additionally, Dr. Bello noted that Mr. Gaddy's symptoms were severe enough that they may frequently interfere with his attention and concentration, but would only slightly limit his ability to deal with work stress. (R. 284.)

With regard to functional limitations in a competitive work environment, Dr. Bello found that, in an eight hour day, Mr. Gaddy: could walk two city blocks without rest, continuously sit at one time for forty five minutes, stand for no more than two hours, and would need to walk every forty five minutes for fifteen minutes. (R. 285.) Dr. Bello recommended that Mr. Gaddy have a position that would allow shifting positions at will between sitting, walking, and standing, and that he would need to take at least three unscheduled breaks during an eight hour period. Dr. Bello opined that he would need twenty minutes rest before returning to work, but that his legs would not need to be elevated. (R. 285-286.)

Dr. Bello did not believe that Mr. Gaddy required a cane or any other assistive devices. He found that he could lift twenty pounds frequently, but should never lift fifty pounds, and that

15

he would have some significant issues with reaching, handling, and fingering. (R. 286.) Finally, Dr. Bello noted that he believed Mr. Gaddy's condition would produce "good days" and "bad days", he would likely be absent about twice a month, but that there were no other limitations to Mr. Gaddy's ability to work a regular job on a sustained basis. (R. 286-287.)

MOUNT SINAI MEDICAL CENTER

On October 19, 2008, Mr. Gaddy was admitted to Mt. Sinai Hospital Medical Center, with complaints of chest and epigastric pain. (R. 320.) Attending physician, Dr. Mark Silver noted that Mr. Gaddy was not experiencing chest pains at that moment, there were no palpations, and his muscle motor function was normal. *Id.* Dr. Silver recommended that Mr. Gaddy have a follow up with the cardiology clinic. He noted that he needed to lose weight and exercise. Moreover, Dr. Silver suggested that Mr. Gaddy have a consultation to rule out sleep apnea, that he should start on Lipitor at twenty milligrams a day, should have a goal blood pressure level below 130/80, and recommended that he increase his dosage of Enalapril to 5 milligrams twice a day. (R. 321-322.)

Also on October 19, 2008, Mr. Gaddy had a CT done of his abdomen and pelvis. (R. 350.) The findings indicated that his heart was not enlarged and his lung bases were clear. (R. 350.) The scan noted a "fluid containing structure just anterior to the esophagogastric junction" and that it may be a "large

16

diverticula" or a "duplication cyst". *Id.* On October 22, 2008, Mr. Gaddy underwent a cardiology echo and the results showed that his LV cavity and wall were normal and that his mitral inflow was normal. (R. 354.) The test concluded borderline concentric left ventricular hypertrophy and revealed that his left ventricular systolic function was probably normal. *Id.* On October 23, 2008, Mr. Gaddy was discharged from Mt. Sinai by Dr. Mark Silver, with the recommendation that he not drink or smoke, lose weight, and continue use of his at home medications. (R. 330.)

On April 16, 2009, Mr. Gaddy returned to Mt. Sinai Hospital with complaints of abdomen and chest pain. (R. 309.) The hospital attributed his abdomen pain to possible pancreatitis. He was transferred to Rush Hospital to further investigate his complaints of chest pain, as the cardiac catherization lab tables at Mt. Sinai could not support his weight. (R. 312.) Mr. Gaddy was discharged with recommendations that he continue the same medication he had been taking as an outpatient. *Id.*

CARDIAC CATHERIZATION TEST ("CATH")

On April 17, 2009, Mr. Gaddy went to Rush University Medical Center with complaints of chest pain and to have a cath performed. (R. 372.) The cath revealed that Plaintiff's coronary anatomy was normal. *Id.* Mr. Gaddy was discharged the same day and instructed to monitor his weight, eat a diabetic and heart-healthy diet, participate in only light activity, stop

taking Enalapril and Lipitor, and start taking: pantoprazole (40 mg/day), rosuvastatin (40mg/day), lisinopril-hydrocholorthlazide (1 Tab), amlodipine (1 tab 10 mg/day), metoprotol XL (100 mg/day), aspirin chewable (81 mg/day), and melformin (850 mg twice a day). (R. 369-397.)

## IV. THE ALJ'S DECISION

ALJ Edwin Shinitzky issued his decision on July 22, 2009, denying Mr. Gaddy's claim for DIB. He found that Mr. Gaddy was not disabled within the meaning of the Social Security Act under sections 216(i), 223(d), and 1614(a)(3)(A). (R. 12-13.) The ALJ applied the five-step analysis as required by the act under 20 C.F.R. 404.1502(a).

At step one, the ALJ determined that Mr. Gaddy met the insured status requirements of the Social Security Act through December 31, 2008, and that he had not engaged in substantial gainful activity since the alleged onset date of September 1, 2005. (R. 15-16.)

At step two, the ALJ determined that Mr. Gaddy suffered from a number of severe impairments: insulin dependent diabetes mellitus, hypertension, bilateral carpal tunnel syndrome and obesity. (R. 15). The ALJ referenced that there were allegations of pancreatitis, but that they had not been confirmed. *Id.* Additionally, the ALJ noted Mr. Gaddy's claims that his diabetes restricted his vision, but ultimately found Dr.

Buranosky's opinion that a restricted visual field was inconsistent with his evaluation persuasive. Particularly, he cited Dr. Buranosky's notes explaining that Mr. Gaddy's condition would improve with treatment as his blood sugar stabilized. *Id.* Also, the ALJ referenced the Diabetes Mellitus Residual Functional Capacity Questionnaire filled out by treating physician Dr. Bello. *Id.* The ALJ noted Dr. Bello's opinion that Mr. Gaddy's symptoms were severe enough to frequently interfere with attention and concentration, however, he also noted Dr. Bello's opinion that Mr. Gaddy would be only slightly limited in his ability to deal with work stress, and that his prognosis was that Mr. Gaddy's odds of improvement would be fairly good with medication. *Id.*

At step three, the ALJ concluded that Mr. Gaddy did not have an impairment or combination of impairments that met or equaled the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1525, 404.1526, 416.925, and 419.926). (R. 16.) The ALJ acknowledged the evidence of sufferance from insulin-dependent diabetes, but noted that the record does not show neuropathy or disorganization of motor function. *Id.* Additionally, the ALJ acknowledged Mr. Gaddy's obesity and history of hypertension, however, he found the hypertension to be under control with prescribed medication and that there was no evidence of any organ damage. *Id.* With regard to Mr. Gaddy's

19

daily activities, he found that Mr. Gaddy was able to perform them without significant difficulty, moreover, he determined that Mr. Gaddy's carpal tunnel syndrome was mild at most. *Id*. Before moving on to step four, the ALJ determined that Mr. Gaddy had the residual functional capacity to perform sedentary work and maintain a regular work schedule with less than a day and a half of absences, and with normal breaks, he could stay on task in excess of eighty five percent of the workday. *Id*. While the ALJ noted Mr. Gaddy's allegations of frequent urination, he found them unsupported by the record. (R. 18.) Additionally, he gave the medical and vocational expert's testimony controlling weight due to their findings being consistent with the medical record presented at the hearing. (R. 17.) Finally, the ALJ described the various medical tests performed on Mr. Gaddy as unremarkable, while noting the inconsistency between the treating physicians RFC determination and Mr. Gaddy's hearing testimony. *Id*.

At step four, the ALJ determined that Mr. Gaddy could not perform his relevant past relevant work as an assistant manager at Rent-A-Center because the ALJ found his remaining functional capacity to be reduced to the performance of sedentary level work. (R. 18.)

At step five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Mr. Gaddy could perform. Pursuant to SSR 00-4p, the ALJ considered

the vocational expert's testimony. The ALJ reached his decision after the VE testified that, considering Mr. Gaddy's personal limitations that erode the unskilled sedentary occupational base, as well as taking into account Mr. Gaddy's age, education, work experience, and residual function capacity, he would be able to make a successful adjustment to work that exists in the economy. The VE testified that Mr. Gaddy would be capable of performing jobs such as security identification monitor, and informational clerk. (R. 19.)

Following the five step analysis, the ALJ determined that Mr. Gaddy was not disabled within the meaning of the Social Security Act because he found Mr. Gaddy to be capable of making an adjustment to other work that exists in significant numbers in the national economy. (R. 19-20.) He found that Mr. Gaddy had not been under a disability from September 1, 2005 through the date of the decision and, therefore, was not entitled to disability benefits under 216(i) and 223(d) of the Social Security Act. (R. 25). Nor was Mr. Gaddy entitled to supplemental security income under section 1614(a)(3)(A). *Id.*

## STANDARD OF DISABILITY ADJUDICATION

In order to be entitled to benefits under the Social Security Act, a claimant must be evaluated under a five-step inquiry and found to be "disabled." 20 C.F.R. § 404.1520. Step

one requires the ALJ to determine if the claimant is employed.
Under step two, the ALJ must determine whether the claimant has a
severe impairment as defined by the Social Security
Administration. At step three, the ALJ determines whether the
impairment meets or is medically equal to one of the listed
impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. During
step four, the ALJ evaluates the claimant's "Residual Functional
Capacity" ("RFC") and determines whether they can perform their
past relevant work. Finally, during step five, the ALJ
determines whether the claimant has the ability to perform other
work that is prevalent in the national economy.

### STANDARD OF REVIEW

When addressing an appeal of an ALJ's decision, a district
court must affirm the decision if it is supported by substantial
evidence and free from legal error. 42 U.S.C. § 405(g); *Steele
v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). When determining
whether the evidence is substantial, it must be "more than a mere
scintilla." *Richardson v. Perales*, 402 U.S. 401 (1971). It is
"such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." *Id.* When reviewing the ALJ's
decision for substantial evidence, the court cannot "displace the
ALJ's judgment by reconsidering facts or evidence or making [a]
credibility determination." *Skinner v. Astrue,* 478 F.3d 835 (7th
Cir. 2007). Should there be conflicting evidence that leads

22

reasonable minds to differ in opinion, it is solely the ALJ's responsibility to determine whether the claimant is disabled, not the district court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Even though an ALJ is not required to address every piece of evidence in the record, he must furnish his analysis through building a logical and accurate bridge between the evidence and his conclusions, thus allowing a reviewing court to conduct a meaningful review of the ultimate findings of the Social Security Administration. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). A court must affirm an ALJ's decision if there is substantial evidence supporting his decision, unless the ALJ does not articulate the grounds for his decision in such a way that allows a meaningful review. *Sims*, 309 F.3d at 429.

## DISCUSSION

Mr. Gaddy argues that the ALJ's decision should be reversed or remanded because he: (1) improperly gave controlling weight to the medical expert; (2) improperly discounted the opinion of Mr. Gaddy's treating physician; (3) made a flawed RFC determination; (4) failed to make a proper credibility analysis; and (5) improperly relied on the vocational expert's testimony. For the reasons set forth below, Plaintiff's motion for summary judgment is denied.

## I. **WEIGHT GIVEN TO THE MEDICAL EXPERT**

Mr. Gaddy first argues that, although only treating physicians are allowed controlling weight, the ALJ gave controlling weight to the ME's opinion, instead. Moreover, Mr. Gaddy opines that, even if it is determined that the ALJ did not give controlling weight to the ME's testimony, he still failed to explain specifically what weight was given to Mr. Gaddy's treating physicians.

Generally, controlling weight is given to the treating physician, however, in the event that testimony is not consistent with other substantial evidence in the case record or the nature and severity of impairments are not well-supported by medically acceptable clinical and laboratory diagnostic techniques, the ALJ is not required to give the treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(c)(2). In the event the treating physician's evidence is not given controlling weight, an ALJ may give that weight to non-examining physicians so long as an explanation is provided. *See* 20 C.F.R. § 404.1527(d)(2)(ii).

Contrary to Mr. Gaddy's argument, the Court finds that the ALJ fully explained why he gave "great weight" to the ME's opinion, a decision well within his powers, and finds that the ALJ properly considered the record physicians' opinions, including Dr. Bello, and explained his reasons for discounting

24

them, as well. (R. 17). The ALJ explained that he found Dr. Bello's opinion unsupported by objective medical findings. (R. 15-17.) *See* 20 C.F.R. §§ 404.1527(d)(2),(3), 416.927(d)(2),(3); Social Security Ruling (SSR)96-2p (in order to be entitled to controlling weight, a medical opinion must be rendered by a treating source, be well-supported by medically acceptable clinical and laboratory diagnostic techniques, and also must not be inconsistent with other substantial evidence in the record). Notably, when asked for clinical findings on the form he completed, Dr. Bello only wrote "slight leg edema." (R. 284.) Therefore, the ALJ determined that, unlike the record physician's findings, the ME's statements and opinions deserved "great weight" because they were "supported by the objective medical record." (R. 17.) Furthermore, while the ALJ still considered Mr. Gaddy's physicians' assessments, he diminished their weight due to finding them inconsistent with other substantial evidence in the record, including that of Mr. Gaddy's own testimony regarding his daily household activities and full-time child care duties. (R. 17.)

Mr. Gaddy's argument that only treating physicians opinions may be given controlling weight is incorrect. The Court finds that, while the ALJ did not explicitly discuss each factor of 20 C.F.R. §§ 404.1527(d), Dr. Bello's opinion was not entitled to controlling weight because it was not supported by objective

medical evidence and was inconsistent with other substantial evidence in the record. *See* 20 C.F.R. §§ 404.1527(d)(2),(3),(4); 416.927(d)(2). The ALJ did not err by finding that the ME's opinion was entitled to greater weight, than Mr. Gaddy's treating physicians'.

## II. **CONSIDERATION OF PLAINTIFF'S DIABETIC NEUROPATHY DIAGNOSIS**

Mr. Gaddy next argues that the ALJ's consideration of his treating physicians' opinion was erroneous because the ALJ failed to recognize his diagnosis of diabetic neuropathy. Indeed, the ALJ erroneously stated that, "[w]hile there is evidence of insulin-dependent diabetes mellitus, claimant has not been diagnosed with neuropathy and does not suffer from significant disorganization of motor function." (R. 16.) However, the Court finds that the ALJ's comment that Mr. Gaddy had not been diagnosed with diabetic neuropathy harmless, as the ME recognized the diagnosis and accordingly limited the use of his hands, and, more importantly, the VE took into account his hand limitations when identifying jobs. Therefore, while the ALJ's misstatement of Mr. Gaddy's diagnosis was made in error, it was of no affect and did not amount to reversible error.

## III. **THE ALJ'S RFC DETERMINATION**

Next, Mr. Gaddy contends that the ALJ made an erroneous RFC determination by neglecting to take into consideration evidence

of his hand limitations, frequent urination, and environmental limitations. After considering the record and testimony, the ALJ determined that Mr. Gaddy had a residual function capacity to:

> lift, carry, push, and pull 10 pounds, stand/walk 2 hours out of an 8-hour workday, and sit 6 hours out of an 8-hour workday. The claimant is able to maintain a regular work schedule with less than 1 1/2 days absence per month, with normal breaks; he can remain on task in excess of eighty-five percent of the workday.

(R. 16.)

Based on this RFC, the ALJ determined that Mr. Gaddy could no longer perform his past relevant work as an assistant manager at Rent-A-Center, as it required light exertional demand. (R. 18.) However, after also taking into consideration Mr. Gaddy's age, education, and work experience, the ALJ found that jobs existed in significant numbers in the national economy that he could still perform. (R. 19.)

Mr. Gaddy argues that the residual functional capacity determination was erroneous because the ALJ failed to consider all of his impairments, and also failed to explain how he reached his RFC determination. Mr. Gaddy asserts that the ALJ specifically failed to recognize his problems with his hand and motor skills, frequent urination, and environmental limitations. The Court, on the contrary, finds that the ALJ provided substantial evidence of specifically taking into consideration Mr. Gaddy's impairments, as well as why he reached the RFC determination that he did.

The ALJ explained that he:

> does not neglect the fact that the claimant
> experiences residuals associated with insulin
> dependent diabetes mellitus, hypertension, morbid
> obesity, as well as some residuals of mild carpal
> tunnel syndrome, the record fails to reflect that
> those impairments are so severe and limiting as to
> warrant a finding of disability. Notably, physical
> examinations have been relatively unremarkable with
> indications that diabetes and hypertension are
> controlled with medication.

(R. 22).

With regard to Mr. Gaddy's allegations of frequent urination,
which he felt would ultimately take him off task, the ALJ found
informative the ME's testimony that, even giving Plaintiff the
benefit of the doubt of some frequent urination secondary to his
Lasix intake and accounting for a large daily intake of water, as
well as accounting for some restroom trips during the workday,
Mr. Gaddy would still be within control of a workable schedule.
(R. 18.) Therefore, it is evidenced that the ALJ did take Mr.
Gaddy's various impairments into consideration, and, nonetheless,
decided not to assign them significant weight as he found the
medical record unsupportive. (R. 17-18.) The Court agrees. The
ALJ provided substantial evidence of Mr. Gaddy's daily activities
and intact social functioning, which worked against his
statements concerning his symptoms limiting effects, reasonably
allowing the ALJ to reach the RFC determination that he did.

## IV. **THE ALJ'S CREDIBILITY ANALYSIS**

Next, Mr. Gaddy argues that the ALJ's credibility determination was flawed, as he failed to provide an explanation for not finding his testimony credible. However, after reviewing the record, the Court finds that the ALJ did provide a logical bridge to his conclusion that Mr. Gaddy's testimony was not credible, specifically underscoring that his ability to perform different daily and social activities was inconsistent with his claims. The ALJ recorded:

> [n]otably, at the hearing, claimant testified that he takes 3 children to and from the nearby grade school; that he is able to lift 10 pounds with the right dominant hand; and he climbs 12 steps on a staircase regularly, in spite of reportedly feeling numbness in both hands and feet bilaterally. In fact, claimant relates that he watches the same children mentioned above as a full-time activity.

(R. 17.)

Moreover, the ALJ explained that he also found no support for one of Mr. Gaddy's treating physician's assessments, suggesting that he would need to be absent from work two times per month. (R. 17.) Instead, the ALJ explained that he found Mr. Gaddy's own admission of compliance with day-to-day chores, the ability to use public transportation without difficulty to get to his doctor's visits, as well as there being no further need for follow-up doctor or emergency room visits, as substantial evidence against his claims of limitations. *Id.* The Court finds the ALJ's decision substantially supported by evidence that provides a logical bridge to his conclusion. The ALJ found that

the symptoms of Mr. Gaddy's impairments could be reasonably expected, yet he still ultimately determined that his statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible, to the extent they are inconsistent with the above residual functional capacity assessment. (R. 17.) The Seventh Circuit has long held that an ALJ's credibility finding is entitled to considerable deference. In *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)(quoting *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)), the Court articulated its well-established rule that an ALJ's credibility determination will not be overturned unless "claimant can show it was 'patently wrong.'" Above are valid reasons for the ALJ to discount Mr. Gaddy's credibility, and the Court will give deference to them.

## V. THE ALJ'S CONSIDERATION OF THE VOCATIONAL EXPERT'S TESTIMONY

Finally, Mr. Gaddy argues that the ALJ improperly accepted the testimony of the VE, as his testimony was inconsistent with the Dictionary of Occupational Titles ("DOT"). Specifically, Mr. Gaddy argues that the VE failed to provide the exact DOT numbers for the position titles he testified to, and that because the ALJ failed to ensure that the VE's testimony was consistent with the DOT prior to relying on it, a reversal is warranted. The Court finds that, while the ALJ, and Mr. Gaddy's counsel for that matter, failed to inquire as to whether there was a conflict

between the VE's testimony and the DOT, as provided by Social Security Ruling (SSR) 00-4p, such failure does not constitute reversible error.

The VE testified to there being two positions that Mr. Gaddy could perform given his RFC and specific limitations, but he was not asked for and did not provide the corresponding DOT numbers, only the titles -identification/security clerk and information clerk. (R. 66-67.) Counsel for Mr. Gaddy now asserts that his own DOT search for those two titles returned four DOT numbers, and that each of which corresponded to positions beyond that which Mr. Gaddy is capable of performing, with one job specifically requiring frequent fingering. (Pl. Brief at 18.) While counsel's search identified four DOT numbered positions (DOT ## 209.362-022, 205.362-22, 237.367-018, 237.367-022), not one of the numbers can assuredly correspond to the position titles that the VE submitted as appropriate for Mr. Gaddy, as he gave no numbers. Moreover, it is evident that the VE took into consideration Mr. Gaddy's limitations and did not consider jobs beyond Mr. Gaddy's ability. The following dialogue between the ALJ and VE confirms this:

> Q: Would there be work in relation to telephone
> solicitor?
> A: Well, no. I've eliminated that job because
> [inaudible] hands.
> Q: Date entry type?
> A: Had to eliminate those jobs, too.
> Q: Telephone operator, what do they do?
> A: Well, a telephone solicitor is writing. He'd
> be talking on the phone but he'd also be writing.

Q: Either making written or computer entry.
        A: Correct, and that would [inaudible]
        Q: Do you feel that work is out, doctor, the use
        of the keyboard on the basis of activities that
        you referred to as occasional?
        A: Lot of keyboarding would be out [inaudible]
(R. 68.)

The Court views the testimony above as substantial evidence that the VE considered all of Mr. Gaddy's limitations, and paid particularly close attention to his hand/fingering issues when determining viable jobs in the national market. Mr. Gaddy additionally opined that the VE failed to consider his need for more frequent restroom breaks. However, as already articulated above, the ALJ reasonably found that claim unsupported by the medical record and instead relied upon the ME's opinion that, even giving Mr. Gaddy the benefit of the doubt, he could still manage a workable schedule around his restroom breaks. Therefore, the Court finds the VE's determinations and the ALJ's reliance substantially and logically supported.

All of Mr. Gaddy's limitations considered, the VE determined that there were two possible jobs, totaling 3,500 positions, that Mr. Gaddy was capable of performing. Although the VE was snot asked by the ALJ or Plaintiff's counsel to provide DOT numbers, and the ALJ relied on the VE's testimony before knowing the corresponding positions' specific DOT numbers, the Court does not find such a situation to warrant reversal, as it is evident that the testimony of the VE was nonetheless accurate and appropriate.

The existence of 3,500 jobs that Mr. Gaddy could indeed perform is substantial evidence supporting the ALJ's step-five finding that Mr. Gaddy was not disabled and not entitled to disability insurance benefits or supplemental security income, and the Court gives deference to that decision.

### CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment is denied, and the Commissioner's cross-motion for summary judgment is granted. The decision of the ALJ is affirmed.

Dated: September 27, 2012

E N T E R E D:

_Arlander Keys_
_____

ARLANDER KEYS
United States Magistrate Judge